IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| CAPITAL MEATS, INC., | * | |
| | * | |
| v. | * | Civil No. JFM-15-212 |
| | * | |
| THE MEAT SHOPPE, LLC, et al. | * | |
| | * | |

\*\*\*\*\*\*

## MEMORANDUM

Plaintiff Capital Meats, Inc. ("CMI") brings this lawsuit against several entities referred to collectively here as "The Meat Shoppe" and several former CMI employees who now work for The Meat Shoppe (collectively, "defendants"). CMI alleges that defendants violated Virginia contract law; the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law § 11-1201 *et seq*; and committed several Maryland business and competition-related torts when they resigned en masse to establish and operate The Meat Shoppe. CMI has filed a nine-count amended complaint. (ECF No. 35).

Now pending is a joint motion to dismiss filed by defendants. (ECF No. 38). It is fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff CMI, a Virginia corporation with its principal place of business in West Virginia, is a wholesale distributor of frozen meat, poultry, and seafood. (Am. Compl., ECF No. 35 ¶ 1). CMI operates in sixteen states and has eleven warehouse distribution centers (often referred to as "CMI offices"). (*Id.* ¶¶ 2–3). Relevant to this case are three CMI offices in Maryland: Baltimore, Middle River, and Westminster, and one office in New Castle, Delaware.

(*Id.* ¶ 4).  CMI contracts with independent sales representatives ("Retail Dealers") who sell

CMI's products door-to-door while driving trucks and wearing clothes that display CMI's logo

and name.  (*Id.* ¶ 6).  The Retail Dealers purchase CMI's products "on consignment on a daily

basis without any up-front payment," and return unsold product at the end of the day.  (*Id.* ¶¶

102–103).  CMI maintains a "CMI Database" that tracks inventory, sales, payments by

customers, and balances owed by Retail Dealers.  (*Id.* ¶ 125).  It "provides CMI a competitive

advantage and is not available to others outside of CMI's business."  (*Id.* ¶ 128).  CMI also

maintains an inter-office website ("Call Center Website") which is "a centralized system for

customer payment processing."  (*Id.* ¶ 137).  Both the Database and Call Center Website stored

information that the Retail Dealers used to improve their sales through greater efficiency.

Defendant Meghan Tunney had access to the Database and Call Center Website as part of her job

as CMI's Chief Auditor.  (*Id.* ¶ 30–31).

Each of the individual defendants except for Meghan Tunney was a Retail Dealer who

signed a Distributorship Agreement with CMI.[1]  (*Id.* ¶ 110).  Section 11 of the Distributorship

Agreement contains a non-compete and non-solicitation clause ("the covenant") which states—

> Upon termination of this Agreement and for a two (2) year period thereafter,
> Retail Dealer covenants and agrees not to engage, directly or indirectly, in the
> business of selling meat, poultry, and seafood products door-to-door in the
> Territory granted to Retail Dealer pursuant to this Agreement. Retail Dealer
> further agrees that upon the termination of this Agreement that he shall not solicit,
> either directly or indirectly, any customers with whom he had dealt while acting
> as an independent contractor for Supplier for the sale of meat, poultry, seafood,
> and other food products.

---

[1] Liam Tunney, Brian Jones, Ronald Lee Fincham, Jr., Harvie Combass, Henry DeFries, Arnold
James, Robert Omodho, and Jesse Petway. (ECF No. 35 ¶ 9).  Meghan Tunney, Liam Tunney's
sister, began working at CMI in 2003 and resigned as the Chief Auditor.  (*Id.* ¶¶ 30–31).  Some
of the Retail Dealer defendants also had managerial responsibilities at CMI, including Liam
Turner who was a Regional Manager as of 2014.  (*Id.* ¶¶ 27–28).

(*Id.* ¶ 112).  CMI's amended complaint acknowledges the Retail Dealers were not awarded

"exclusive rights to sell in any territory."  Instead, the Retailer Dealers were allowed to sell

within any area they could reach during a single day so that they could return unsold product

back to CMI's warehouse for storage.  (*Id.* ¶ 110).  Indeed, ¶ 2 of the Distributorship Agreement,

"Rights and Territories," was left blank on each of the Retail Dealer defendants' contracts,

except for Liam Tunney, whose contract had "Any" written in each of the blanks.  (ECF No. 35-

4, 6, 8, 10, 12, 14, 16, 18).

On January 5, 2015, the Retail Dealer defendants did not show up for their regularly-

scheduled warehouse pickups, and Meghan Tunney informed CMI that she had resigned

effective immediately.  (*Id.* ¶¶ 144–146).  CMI asked the defendants to return all of CMI's

property in their possession, including Megan Tunney's access to the CMI Database which had

been installed on her personal computer.  (*Id.* ¶ 134).  Meghan Tunney never responded, until

after this lawsuit was initiated and the CMI Database was provided to her counsel in February

2015.  *Id.*  There are other allegations around this time frame, including surveillance video

footage of: Meghan Tunney moving around files inside CMI's Baltimore office and removing

some of them from the office; Combass and Fincham removing documents and property; and

shredding of documents by a CMI employee later hired by The Meat Shoppe.  (*Id.* ¶¶ 147, 150,

152, 155).

The individual defendants and around 100 of CMI's sales force began working at (and,

CMI alleges, began operating) competing businesses, all operating under the name The Meat

Shoppe.  (*Id.* ¶¶ 159–60).  It is similarly "a wholesale meat distributor that sells and distributes

frozen meat, poultry, and seafood via door-to-door sales in Maryland, the District of Columbia,

Delaware, Pennsylvania, Virginia, and West Virginia."  (*Id.* ¶ 15).  Defendants allegedly

"engaged in malicious and deceitful actions in an effort to solicit and steal CMI's customers," including by making false statements to customers and CMI employees that CMI is or will be out of business so as to entice them to switch to The Meat Shoppe.  (*Id.* ¶¶ 164–65).  The four CMI regional offices at issue lost significant business to The Meat Shoppe subsequent to the mass resignation on January 5, 2015, which resulted in CMI losing around 70% of its revenue.  (*Id.* ¶172).

## STANDARD

When ruling on a motion brought under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim . . . . However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (internal

citations and quotation marks omitted).  "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

In deciding whether to grant a motion to dismiss, the court may also consider documents attached to the complaint as well as documents attached to the motion to dismiss, provided that they are "integral to the complaint and authentic."  *See, e.g.*, *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

## ANALYSIS

Defendants move to dismiss all nine counts in CMI's amended complaint.  Neither side disputes that Virginia law applies to CMI's contract claims pursuant to ¶ 16(g) of the Distributorship Agreements.  Maryland law applies to CMI's MUTSA claim and remaining tort allegations.  Each count is discussed in order below.

## I.      Breach of Covenant Not-to-Compete.

CMI's first cause of action alleges that all of the Retail Dealers breached ¶ 11 of their respective Distributorship Agreement contracts—the non-compete and non-solicitation covenants.  Although the clause is supported by consideration, the omission of material terms renders the clause unenforceable and warrants dismissal of Count I.

### A.  The contract and non-compete clause are supported by consideration.

Under Virginia law, a valid contract requires proof of "an offer, acceptance, and consideration."  *Neil v. Wells Fargo Bank, N.A.*, 596 F. App'x 194, 196 (4th Cir. 2014) (citing *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928 (Va. 1991)).  Offer and acceptance can be proved through signed contracts and also "inferred from the acts and conduct of the parties."  *Durham v. Nat. Pool Equip. Co. of Va.*, 138 S.E.2d 55, 58 (Va. 1964).  As for consideration,

"Virginia has long followed the 'peppercorn' theory of consideration, under which even a peppercorn suffices as consideration." *Sfreddo v. Sfreddo*, 720 S.E.2d 145, 153 (Va. Ct. App. 2012) ("A peppercorn has been equated with a cent."). If only nominal consideration was provided, however, Virginia law requires proof that the transaction was indeed a "bargained for exchange" and not a gift. *Id.* at 154 (quoting *Chang*, 410 S.E.2d at 930).

Here, the individual Distributorship Agreements reflect a valid, bargained-for contract between CMI and the Retail Dealers. Defendants do not dispute that all parties operated under the respective Distributorship Agreements without complaint until the events of January 5, 2015.[2] Instead, defendants argue that ¶ 11 was not supported by consideration. The non-compete clause prohibited the Retail Dealers from selling meat door-to-door "in the Territory granted to" them under ¶ 2 of the Distributorship Agreement, "Rights and Territories." Paragraph 2, however, was left blank on all but one of the contracts (Liam Tunney's, which instead lists "Any" and is thus equally non-specific) which, defendants argue, is evidence that CMI did not provide exclusive territory to the Retail Dealers in consideration for the non-compete clause.

Although the omission of a defined territory in ¶ 2 is fatal to Count I (discussed further below), it does not render the non-compete clause invalid for lack of consideration. Neither side disputes that the relationship between the parties was commercial, and these kind of contracts are a collection of various promises and exchanges that are not neatly divisible into directly corresponding benefits and detriments. *See, e.g.*, *SunTrust Mortg., Inc. v. Simmons First Nat. Bank*, 861 F. Supp. 2d 733, 736 (E.D. Va. 2012) (describing "mutual promises as consideration,

---

[2] The fact that CMI did not counter-sign the contracts is irrelevant in this case, for the parties against whom enforcement is sought—the Retail Dealers—did. *See, e.g.*, *Persinger & Co. v. Larrowe*, 477 S.E.2d 506, 509 (Va. 1996) (holding that parties "who were signatories to the agreement would remain bound" to it).

even if the promises apply to different contract terms or are conditioned upon performance by the other party"). Even if a Retail Dealer was not given exclusive territory under ¶ 2, therefore, the omission of that specific benefit does not automatically void ¶ 11 for lack of consideration. CMI provided the Retail Dealers other benefits under the Distributorship Agreement, including compensation for selling CMI's products. I conclude that CMI has sufficiently alleged offer, acceptance, and consideration as to ¶ 11 of each Distributorship Agreement.

**B.  The non-compete clauses omit material terms.**

The restrictive covenants in ¶ 11 may be supported by consideration, but they are unenforceable due to the omission of material terms. Restrictive covenants, like any contract, "must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable." *Dean v. Morris*, 756 S.E.2d 430, 537 (Va. 2014) (internal citations omitted). Courts must look within the "four corners" of the contract to ascertain meaning and intent. *See, e.g.*, *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013) ("[C]ourts are bound to say that the parties intended what the written instrument plainly declares.") (quoting *Wilson v. Holyfield*, 313 S.E.2d 396 (Va. 1984)). Only if a term is ambiguous may extrinsic parol evidence be consulted to "establish the real contract between the parties." *Prospect Dev. Co., Inc. v. Bershader*, 515 S.E.2d 291, 296 (Va. 1999) (internal citations omitted),

In general, the validity of restrictive covenants like the non-compete clause in ¶ 11 turns on its reasonableness from three perspectives: (1) the employer's, (2) the employee's, (3) and "sound public policy." *Advanced Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 155 (Va. 1998). Informing that analysis are the "function, geographic scope, and duration" of the covenant. *Home Paramount Pest Control Comps., Inc. v. Shaffer*, 718 S.E.2d 762, 763–64 (Va.

2011).  Virginia law requires that restrictive covenants be "narrowly drawn . . . and any ambiguities in the contract will be construed in favor of the employee."  *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005).  Here, as described above, the "Territory" that Retail Dealers are prohibited from competing in after their CMI employment ends is defined by ¶ 2 of the Distributorship Agreement.  Defining the "Territory," therefore, is a material term necessary for evaluating the geographic scope of the non-compete clause and the larger question of its enforceability.  The problem with each of the Distributorship Agreements cited and attached by plaintiffs, however, is that ¶ 2 is blank—no county and state is listed.

Facially, therefore, there is no non-compete clause to enforce because "Territory" as it is used in ¶ 11 is meaningless.  Even though the two-year duration and function of preventing the Retail Dealers from poaching CMI's individual customers appears reasonable, CMI's decision to omit a geographic scope on these facts renders ¶ 11 overbroad and unreasonably "harsh and oppressive" to the Retail Dealers.  *See Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001).  Some courts have upheld a non-compete clause despite the omission of a geographic scope, *see, e.g.*, *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011), but cases like *Mahan* are distinguishable from the contract between CMI and the Retail Dealers because ¶ 11 explicitly limits the geographic scope of the covenant to a defined "Territory."  Instead of evaluating a complete restrictive covenant with no explicit geographic scope, CMI is asking me to enforce an incomplete covenant with a required but omitted geographic scope.  This distinction both distinguishes *Mahan* and renders ¶ 11 unenforceable.

CMI does not dispute that ¶ 2 was left blank and that no Retail Dealers were granted exclusive territory, but argues in response that there is an ascertainable geographic scope—the

territory "which [the Retail Dealers] serviced while working for CMI."  (*Id.* at p. 240).  Even if

this parol evidence were admissible, it fails to cure the defect because Virginia law provides "no

authority for courts to 'blue pencil' or otherwise rewrite the contract to eliminate any illegal

overbreadth."  *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 529 (E.D. Va. 2006)

(internal quotation marks omitted) (holding that "courts . . . must take the non-compete provision

as written").  But having me take a "blue pencil" to ¶ 2 is precisely what CMI is asking—cross

out "Count, State of" and instead write something to the effect of "wherever the Retail Dealer

sold CMI products during the duration of his or her employment."  That kind of textual surgery

is expressly prohibited under Virginia law, especially when the employer seeks to enforce a

contract that it wrote.  *See Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1523 (W.D. Va. 1995)

(describing "Virginia's rule of strict construction against the employer").[3]

      CMI is correct to note that the Retail Dealers "agreed to the omission of exclusivity when

they signed the agreements, and the parties subsequently performed accordingly."  (ECF No. 39

at p. 19).  The Retail Dealers, however, are not seeking to enforce ¶ 2 or ¶ 11 against CMI.

Instead, CMI is attempting to enforce a contract provision it drafted but then failed to complete.

Based on the four corners of the contract, the non-compete clause in ¶ 11 is unenforceable

because I cannot properly evaluate its reasonableness without a geographic scope.

---

[3] CMI argues in the alternative that Maryland contract law—which permits "blue penciling" in certain situations—should apply to ¶ 2 because of public policy concerns and the fact that the majority of the conduct at issue took place in Maryland.  Rather than engage in a conflict-of-law analysis, I find that Maryland law does *not* support CMI's argument.  *See Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 752–53 (D. Md. 2003) (distinguishing between "removing the offending language" on the one hand with "supplementing or rearranging the remaining language" on the other).  Here, CMI is not simply asking me to excise terms but instead to add and rearrange contract language.  This kind of "flexible blue penciling" was endorsed by the Maryland Court of Special Appeals in the *Holloway* case, but as I noted in *Conrad*, "[n]o Maryland case since *Holloway* has applied the flexible approach" and it was a departure from "the traditional use of the strict divisibility rule by Maryland courts."  *Conrad*, 292 F. Supp. 2d at 757–58.

Finally, The parties make separate arguments regarding the non-solicitation clause—the second sentence in ¶ 11—but I find it to also be unenforceable because it lacks a duration.  CMI argues that the two-year period in the non-compete clause applies to the non-solicitation clause, but I will not read that limit into the second sentence.  Non-solicitation clauses, like non-compete clauses, are construed against the employer.  CMI could have added the same two-year term to the second sentence, and therefore its omission could reflect CMI's intention for the duration to be indefinite.  Regardless, I decline to inquire into CMI's motivation or "blue pencil" in that limitation.  Absent a temporal duration, the anti-solicitation clause is similarly unenforceable. Count I of CMI's amended complaint, therefore, is dismissed.

## II.   Violation of the Maryland Uniform Trade Secret Act ("MUTSA").

Count II of CMI's amended complaint alleges that defendants violated the Maryland Uniform Trade Secret Act ("MUTSA"), Md. Code Ann., Com. Law § 11-1201 *et seq*.  The MUTSA provides monetary and injunctive relief for the misappropriation of trade secrets. Defendants move to dismiss this count on two grounds: (1) the CMI database and the CMI Call Center Website are not "trade secrets" under the MUTSA, and (2) CMI has not alleged that any defendant in fact "misappropriated" that information.  Neither argument is persuasive.

### A.  The database and website are "trade secrets."

The MUTSA protects "trade secrets," which it defines as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e).  In addition, Maryland courts look to the six-part test

in the Restatement of Torts "as helpful guidance to determine whether the information in a given

case constitutes 'trade secrets' within the definition of the statute."  *Bond v. PolyCycle, Inc.*, 732

A.2d 970, 974 (Md. Ct. Spec. App. 1999) (internal citations omitted).[4]  I find that CMI has

properly alleged sufficient facts that, if proven true, would establish the Database and Call

Center Website as "trade secrets" under the two-part MUTSA test.

First, the two services were highly valued by CMI.  Value can be measured in several

ways, including the amount spent by CMI to create the Database and Call Center Website—

allegedly over $260,000 and $500,000, respectively.  (ECF No. 35 ¶¶ 127, 137).  CMI invested

that money with the intent of deriving a greater economic benefit over time, which also allegedly

occurred in the form of more efficient door-to-door sales and correspondingly higher revenues.

CMI and the Retail Dealers utilized the information in regard to customers, their payment

information, and what products they bought to better target regions and customers to increase

sales.  (*Id.* ¶ 138).  Moreover, the value of the Database and Call Center Website continued to

increase as more sales were made and additional information was gathered and entered.

In response, defendants argue that these lists are commonly created by companies like

CMI and, therefore, are not sufficiently unique to have any actual economic value.  Defendants

miss the mark, however, because the trade secret is the information itself—the customers and

products they bought—not the type of software or whether other companies compile similar lists.

---

[4] They are: "(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [that] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to [its] competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Bond*, 732 A.2d at 973 (quoting Restatement of Torts § 757 cmt. b (1939)).

*See, e.g.*, *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, No. 14-2827, 2014 WL 7336691, at

\*14, __ F. Supp. 3d ___ (D. Md. Dec. 19, 2014) ("Plaintiffs' customer list has economic value

because, according to Plaintiffs, it is, among other things, a compilation of customer preferences,

it was not generally available to the public, and it was kept secret.").  Moreover, defendants have

not adequately contested the fact that the information contained within the Database and Call

Center Website was not public knowledge outside of CMI and the individual Retail Dealers.

This exclusivity and confidentiality is another marker of economic value.  *See NaturaLawn of*

*Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 399 (D. Md. 2007).

   Second, CMI has sufficiently alleged that it undertook reasonable efforts to maintain the

secrecy of the information.  Regarding the Database, CMI alleges that access was limited to

certain "authorized users," including Meghan Tunney who was a "trusted member of CMI's

management team" at the time.  (ECF No. 35 ¶¶ 132–34).  The database itself was secured and

only stored on CMI's server or CMI-owned computers, requiring authorization credentials for

access.  As for the Call Center Website, CMI once again restricted access by requiring "office

log-ons and passwords" which were only given to Meghan Tunney, Jones, Fincham, Combass,

DeFries, and Omodho.  Tunney had access because of her management role, while the other five

defendants required access for their management of regional offices.  (*Id.* ¶139).  After the mass

resignation on January 5, 2015, CMI cancelled and removed access to the Database and Call

Center Website for the employees who had left, including Meghan Tunney.  I am persuaded that

these allegations sufficiently demonstrate CMI's "reasonable efforts" to maintain the secrecy of

the database and call center website.  *See EndoSurg Med., Inc.*, 2014 WL 7336691, at \*12.  In

combination with their value, no more is required to sufficiently allege that the information

constituted "trade secrets."

**B. CMI has sufficiently alleged that defendants misappropriated its trade secrets.**

Plaintiffs have also sufficiently alleged that defendants misappropriated those trade secrets to establish and operate The Meat Shoppe under the MUTSA.  Of the several misappropriation definitions in § 11-1201(c), one is the:

> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) Used improper means to acquire knowledge of the trade secret; or
>>
>> (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>>> 1. Derived from or through a person who had utilized improper means to acquire it;

Md. Code. Ann, Com. Law § 11-1201(c)(2).  Here, CMI alleges that certain defendants (chiefly Meghan Tunney) directly obtained the information contained in the Database and Call Center Website through "improper means" and then distributed that information to former Retail Dealers who joined The Meat Shoppe.  All defendants then used  that information to their competitive advantage.  CMI has also met its burden under Rule 12(b)(6) on this issue.

Because the information regarding customers and their purchases were trade secrets that CMI took reasonable efforts to protect, any use of that information for purposes unrelated to conducting CMI business required its "express or implied consent."  *Bond v. PolyCycle, Inc.*, 732 A.2d 970, 977 (Md. Ct. Spec. App. 1999) (quoting *Diamond v. T. Rowe Price Assocs.*, 852 F. Supp. 372, 412 (D. Md. 1994)).  The *Bond* court justified that rule by noting, in general, that "a former employee is obligated not to disclose or use the confidential information acquired during his employment."  *Bond*, 732 A.2d at 977.  That is precisely the kind of misappropriation alleged by CMI here—Meghan Tunney and the other defendants with access to the Database and Call Center Website downloaded or otherwise stored that information while employed by CMI

with the intent to use it later to help The Meat Shoppe.  (ECF No. 35 ¶¶ 135, 143).  Moreover,

even if only one or a few of the defendants directly misappropriated the information, the other

defendants are not immunized from liability.  The MUTSA clearly includes within the definition

of misappropriation the use of information by a person who knew or had reason to know that it

was obtained through improper means.[5]  Again, as currently pleaded, CMI alleges that every

Retail Dealer who continued using CMI's customer and product information while working for

The Meat Shoppe knew or had reason to know that the information was obtained and continued

to be utilized improperly.  *See Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190

F. Supp. 2d 785, 8-00 (D. Md. 2002) ("Under MUTSA, the unauthorized use of a trade secret is

actionable.").

      To justify several of their allegations, CMI cites "information and belief."  Although

"conclusory allegations are insufficient to defeat a motion to dismiss," *Harman v. Unisys Corp.*,

356 F. App'x 638, 640–41 (4th Cir. 2009), CMI has alleged more than simple "conclusory

allegations."  Discovery has not yet commenced, and so the specific motivations and potential

information misappropriated by defendants remains exclusively within their knowledge.

Moreover, CMI alleges certain facts pertaining to Meghan Tunney and other defendants

regarding document stealing and shredding that, when combined with allegations based upon

---

[5] In addition to alleging that Meghan Tunney and others downloaded and copied information while employed by CMI in contemplation of later starting the competing The Meat Shoppe business, CMI also alleges that Meghan Tunney used "misrepresentation and deception" to have the Database installed on her personal computer which then facilitated her misappropriation. (*Id.* ¶ 131).  This allegation goes to the "improper means" used by defendants to gain control of CMI's trade secrets and then later disseminate them.

their information and belief, are sufficient to state a plausible claim to recovery under Rule

12(b)(6).[6] Defendants' motion to dismiss Count II of CMI's amended complaint is denied.

## III.    Intentional Interference with Contract.

CMI's third count alleges that defendants intentionally and tortiously interfered with the

individual Distributorship Agreements between CMI and its former Retail Dealers.  Under

Maryland law CMI bears the burden to prove the following five elements:

> 1) the existence of a contract between plaintiff and a third party; 2) defendant's
> knowledge of that contract; 3) defendant's intentional interference with that
> contract; 4) breach of that contract by a third party; 5) resulting damages to the
> plaintiff.

*180s, Inc. v. Gordini USA, Inc.*, 602 F. Supp. 2d 635, 638 (D. Md. 2009) (quoting *Fraidin v.*

*Weitzman*, 611 A.2d 1046, 1057 (Md. Ct. Spec. App. 1992)).  CMI accuses defendants of

tortiously causing CMI's Retail Dealers to breach the restrictive covenant in ¶ 11 and also breach

the overall contract.  Neither allegation, however, even assuming their truth, states a claim upon

which relief can be granted.

CMI's first allegation in this count is that the defendants "caused numerous Retail

Dealers . . . to breach the Covenant contained in each Retail Dealer's Distributorship

Agreement."  (ECF No. 35 ¶ 202).  As discussed above in Section I, *supra*, even though each

Distributorship Agreement between CMI and the individual Retail Dealers were valid and

enforceable contracts, the non-compete covenant in ¶ 11 was not.  Accordingly, the defendants

cannot be liable for tortiously interfering with the non-compete clause when "no valid restrictive

covenant existed."  *Mansell v. Toys R Us, Inc.*, 673 F. Supp. 2d 407, 417 (D. Md. 2009).

---

[6] Courts have been reluctant to grant preliminary injunctions based solely upon "information and belief," but that specific issue (although a form of relief sought by CMI) is not raised in this motion to dismiss.

In the alternative, CMI claims that defendants interfered with the Distributorship Agreements because none of CMI's Retail Dealers who left to join The Meat Shoppe submitted a written termination notice as required under ¶ 9 of their Distributorship Agreements. This claim also fails because CMI cannot prove elements four and five of the cause of action. Paragraph 9 of the Distributorship Agreement specifies that "This Agreement may be terminated by any party immediately upon written Notice." Even if CMI proves that defendants induced the non-defendant CMI Retail Dealers to violate ¶ 9 by resigning without submitting written notice, CMI has not alleged sufficient conduct to transform what is fundamentally a breach of contract claim against the individual Retail Dealers into a tort claim against the defendants. *See Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (noting that the Maryland Court of Appeals "has refused to adopt any theory of tortious interference with contract . . . that coverts a breach of contract into an intentional tort") (internal quotation marks omitted).

In conclusion, defendants' motion to dismiss Count III of CMI's amended complaint is granted.

## IV.    Business-Related Torts.

In Counts IV–VI, CMI alleges that defendants committed three business-related torts—tortious interference with prospective advantage, unfair competition, and injurious falsehood. The three torts are related in that they deter and punish gaining an improper business advantage through intentional deceit and fraud instead of vigorous competition. Because both the scope of the torts and the facts alleged by CMI that pertain to each overlap, I will discuss the three torts together. In short, I find that CMI's allegations sufficiently plead claims upon which relief can be granted.

A. **Causes of action.**

CMI first alleges that defendants committed the broad tort of tortious interference with

prospective advantage through "intentional and willful acts that were calculated to cause damage

to CMI in its lawful business." (ECF No. 35 ¶ 214). The elements are:

> (1) an intentional and willful act on the part of the defendant; (2) calculated to
> cause damage to the plaintiff in plaintiff's economic relations; (3) done with an
> unlawful purpose, without right to justification (which constitutes malice); and (4)
> resulting in actual damage and loss to the plaintiff.

*Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 447 (D. Md. 2012) (citing *Blondell v.*

*Littlepage*, 991 A.2d 80, 97 (Md. 2010)). Plaintiffs often improperly plead the first element—the

act—because it must be conduct "that is independently wrongful or unlawful, quite apart from its

effect on the plaintiff's business relationships." *Kramer v. Mayor and City Council of Baltimore*,

723 A.2d 529, 540 (Md. Ct. Spec. App. 1999). Sufficiently wrongful acts "include common law

torts . . . defamation, injurious falsehood or other fraud." *Id.* (internal quotation marks omitted).[7]

Next, CMI alleges that defendants committed unfair competition. Under Maryland law,

unfair competition "is a more flexib[le] cause of action, but in all instances requires proof of

fraud, deceit, trickery or unfair methods of any sort." *Core Comms., Inc. v. Verizon Md. LLC*,

744 F.3d 310, 324 (4th Cir. 2014). This tort's "flexibility" is illustrated by the Maryland Court

of Appeals's holding that "[w]hat constitutes unfair competition in a given case is governed by

its own particular facts and circumstances." *Delmarva Sash & Door Co. of Md., Inc. v.*

*Anderson Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002) (quoting *Baltimore Bedding*

*Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)). Most simply, "[t]he legal principles which are

---

[7] Because competition in the marketplace is a hallmark of our economy, however, courts must be
careful to avoid punishing competition unless "the means used are, in themselves, improper."
*Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994).

controlling here are simply the principles of old-fashioned honesty." *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc.*, 340 A.2d 736, 748 (Md. 1975).

Finally, CMI alleges that defendants "have knowingly published and publicized false and disparaging statements about CMI's business to CMI's customers and Retail Dealers." (ECF No. 35 ¶ 225). The elements of injurious falsehood are that the defendant: (1) acting with malice; (2) "published a known falsity to a third party"; (3) "that caused special damages." *Nat. Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F. Supp. 2d 494, 511 (D. Md. 1998). The Maryland Court of Appeals has defined special damages as "those which result in a pecuniary loss directly or immediately from the conduct of third persons." *Rite Aid Corp. v. Lake Shore Investors*, 471 A.2d 735, 742 (Md. 1984).

**B. Factual allegations common to each tort.**

CMI alleges the same facts in relation to all three of these business-related torts which can be divided into two broad groups. The first group of facts relates to the "coordinated raid . . . and ransacking of CMI's offices and freezers" and the misappropriation of CMI's trade secrets from its database and call center. (ECF No. 35 ¶¶ 147, 150, 152, 157). Various defendants allegedly stole documents and destroyed others, with the apparent intent to utilize them to establish The Meat Shoppe. CMI alleges that there is surveillance footage of these events. Similarly, CMI claims that Meghan Tunney and a few other defendants accessed the Database and Call Center Website while working at CMI but without its permission to obtain the confidential information contained therein with the intent to help establish The Meat Shoppe. As discussed above in Section II, *supra*, CMI has sufficiently pleaded these factual allegations. As for the other defendants who are not directly implicated in these acts, CMI alleges that they used the improperly obtained information as part of their job with the knowledge that it was

18

unlawful to do so.  Their usage of the information, therefore, also subjects them to potential liability under the three business-related torts.

The second set of factual allegations is that defendants knowingly (or with reckless disregard for the truth) made false and deceitful statements to non-defendant Retail Dealers and CMI customers regarding the business status of CMI and the origin of The Meat Shoppe.  The statements include Liam Tunney telling the non-defendant Retail Dealers on January 5, 2015 that he "was a co-owner of CMI and that he was taking his one-half of the company and renaming it, that CMI was going bankrupt, that CMI's owners were tax evaders," and other allegedly false and defaming statements.  (ECF No. 35 ¶ 163).  All of the defendants are also accused of having "provided false and misleading information to CMI's customers," including the fact that CMI changed its name to The Meat Shoppe, "and that the Meat Shoppe is 'the same company' as CMI."  (*Id.* ¶ 165).

I find these allegations to state claims upon which relief can be granted, and I am not persuaded by defendants' arguments in response.  The fact that defendants used equipment, clothing, and documents with The Meat Shoppe logo does not disprove their alleged deceitful statements to CMI employees and customers.  Indeed, CMI does not dispute the fact that defendants operated with a different logo, but instead alleges that defendants' deceitful and unlawful statements occurred while *explaining* to the non-defendant Retail Dealers and CMI customers why they should now work for and purchase from The Meat Shoppe.  It is those deceitful and false statements which are most damaging to CMI, because customers would be under the false impression that they were either still purchasing from CMI—albeit under a different corporate form—or that CMI was out of business and The Meat Shoppe was thus their next best option.

Finally, CMI has sufficiently alleged damages.  Although CMI does not identify specific customers that it lost to defendants by name, defendants do not seem to dispute the fact that CMI has suffered a significant decline in revenue since the mass resignations that occurred on January 5, 2015—over seventy percent.  (ECF No. 35 ¶ 172).  Drawing all reasonable inferences in its favor, CMI's allegations would entitle it to establish proximate damages resulting from defendants' conduct.  In conclusion, defendants' actions are alleged to have gone beyond "the rough and tumble of the marketplace," *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994), including "trading . . . upon the good name and reputation built by another," *Baltimore Bedding Corp.*, 34 A.2d at 342.  Accordingly, defendants' motion to dismiss Counts VI, V, and VI is denied.[8]

## V.      Civil Conspiracy.

Count VII of CMI's amended complaint alleges that defendants engaged in a civil conspiracy to commit the acts alleged above "and to use such information to operate" The Meat Shoppe and its related entities.  A civil conspiracy "standing alone, is not actionable" under Maryland law and requires proof of a distinct "tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1045 (Md. 1995).  A plaintiff must allege, therefore: (1) an agreement by two or more persons; (2) to commit an unlawful act in furtherance of the agreement; (3) that damages plaintiff.  *Alleco, Inc.*, *v. Harry & Jeanette Weinberg Found., Inc.*, 639 A.2d 173, 176 (Md. Ct. Spec. App. 1994).  Because I have held above that several of CMI's claims withstand defendants' Rule 12(b)(6) motion to dismiss, there

---

[8] Insofar as CMI's allegations regarding these three torts relate to or encompass fraud, they theoretically trigger Federal Rule of Civil Procedure 9(b).  Defendants do not invoke that Rule explicitly in their motion to dismiss.  Even if they did, courts tend to relax Rule 9(b) when the facts pertaining to the fraud are "uniquely within the Defendants' knowledge." *First Mount Vernon Indus. Loan Ass'n v. Smith*, No. 08-2085, 2009 WL 2392132, at *7 (D. Md. July 31, 2009).  I find that exception to be applicable to the alleged facts of this case.

are a serious of wrongful acts which CMI claims defendants conspired to perpetrate.  Moreover,

it is plausible that a civil conspiracy existed among the defendants which was designed to injure

CMI.

In reaching that conclusion I am guided in part by *Daugherty v. Kessler*, 286 A.2d 95,

101 (Md. 1972), which articulated that:

> conspiracy may be shown by a preponderance of the evidence and may be proved
> by circumstantial evidence since almost never is direct evidence available.
> Conspiracy may be shown by inferences drawn from the nature of the acts
> complained of, the individual and collective interests of the alleged conspirators,
> the situation and relation of the parties, their motives and all the surrounding
> circumstances preceding and attending the culmination of the common design.

*Id.*  That aptly describes the factual context presented here, and CMI will have the opportunity to

conduct discovery to uncover admissible facts necessary to prove that a civil conspiracy—

including independent tortious acts—was orchestrated by defendants.  Defendants' motion to

dismiss Count VII is denied.

**VI.    Unjust Enrichment.**

In Count VIII, CMI alleges that all defendants are liable for unjust enrichment by

accepting the benefit of the information contained in the CMI Database but failing to pay CMI

for its value.  This restitutionary remedy "is established when: (1) the plaintiff confers a benefit

upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's

acceptance or retention of the benefit under the circumstances is . . . inequitable."  *Benson v.*

*State*, 887 A.2d 525, 546 (Md. 2005).  I will dismiss this claim because CMI did not confer the

benefit of the database to defendants as is required under the first element—defendants allegedly

stole it.

Typically unjust enrichment is quasi-contractual in nature, but here CMI focuses on the

benefit of the information contained in the database rather than the individual Distributorship

Agreements.  The problem, however, is that an unjust enrichment theory is inapplicable to these facts.  All of CMI's allegations regarding the Database (and Call Center Website) are that defendants covertly misappropriated the information prior to and on January 5, 2015 when they left CMI to join The Meat Shoppe.  Certainly when defendants worked at CMI they knowingly obtained the benefit of the Database to more efficiently sell CMI's products and in return they provided CMI with its contractually mandated share of the revenue, but that time period is not at issue in this dispute.  Instead, CMI focuses on what happened immediately before and after defendants left CMI.  CMI did not intend to confer the benefit of the Database on defendants for use at The Meat Shoppe, which is why defendants face potential liability under the MUTSA and common law business torts.  Those causes of action encompass the same conduct alleged here, and are the appropriate vehicles to obtain CMI's desired remedies (including compensatory damages).  Count VIII, therefore, is dismissed.

## VII.    Breach of Contract.

Finally, CMI alleges in Count IX that Liam Tunney and the Retail Dealer Defendants breached their respective Distributorship Agreements by terminating the contracts without paying their existing unpaid balances that were owed to CMI.  Pursuant to ¶ 10(a) of each Agreement, upon termination of the contract "All amounts owing by Retail Dealer to [CMI] shall . . . become immediately due and payable."  A Retail Dealer could owe a balance because CMI provided its products to them on credit, requiring its share of the revenue and the return of unsold products to the warehouse each day.  If a Retail Dealer had not yet paid CMI its share of the revenue prior to terminating the Distributorship Agreement, that failure would constitute a breach of ¶ 10(a).

As discussed above in Section I, the Distributorship Agreements are valid and binding contracts (except for the restrictive covenants in ¶ 11).  CMI has properly alleged that Liam Tunney and all other Retail Dealer defendants breached ¶ 10(a) and owe CMI the money it is contractually entitled to with sufficient particularity to satisfy Rule 12(b)(6).  Because no more is required, defendants' motion to dismiss Count IX is denied.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part.  Counts I, III, and VIII of CMI's amended complaint are dismissed.


| _____07/09/2015_____ | _____/s/_____ |
| --- | --- |
| Date | J. Frederick Motz |
| | United States District Judge |